**Charlie PORTER, Individually and Executor of the Estate of Mae Katherine Porter, and Betty Jo Sweat, Plaintiffs–Appellees,**

v.

**Lisa C. GREEN, Defendant–Appellant.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Nov. 4, 1987.

Application for Permission to Appeal
Denied by Supreme Court
Jan. 25, 1988.

Nathan Harsh, Harsh, Kelly & Smith, Gallatin, for plaintiffs-appellees.

Robert L. Estes, D. Robert Black, Jr., Stewart, Estes & Donnell, Nashville, for defendant-appellant.

## OPINION

LEWIS, Judge.

This is an appeal by defendant Lisa C. Green from judgments entered on the jury verdicts returned against her and in favor of (1) plaintiff Charlie Porter, individually, in the sum of $20,000.00; (2) plaintiff Charlie Porter as executor of the estate of Mae Katherine Porter in the sum of $13,000.00; and (3) plaintiff Betty Jo Sweat in the sum of $3,000.00.

This case arose out of an automobile accident that occurred on Highway 31 at its intersection with Sumner Hall Road in Gallatin, Sumner County, Tennessee. Plaintiffs were slowing to make a right-hand turn when the vehicle driven by defendant struck the rear of plaintiffs' vehicle and "knocked [it] a complete 180 degree turn."

Defendant has presented three issues for our consideration, the first of which is "[w]hether the Trial Court erred in admitting evidence in the form of deposition testimony of a physician for the jury's consideration at the trial of this case over objections that the evidence was incompetent and inadmissible."

The defendant objected to the testimony of Dr. James E. McGriff regarding permanent disabilities of both Charlie Porter and Mae Katherine Porter. She argues that Dr. McGriff's testimony was insufficient to show that as a result of the injuries they received in the accident they would have any permanent disability and that they would therefore be entitled to recover for future pain and suffering, the loss of income, etc.

Defendant also objected to Dr. McGriff's testimony regarding the history and diagnosis of each of the plaintiffs which was taken by the emergency room physician on the ground that this testimony was hearsay.

We first discuss her objection to Dr. McGriff's testimony regarding permanent injuries.

In the case of Charlie Porter, Dr. McGriff testified in part as follows:

Q. You've seen Mr. Porter on how many occasions as a result of this automobile collision?

A. I've seen him about three or four times. I'm not sure.

Q. Will Mr. Porter or not, in your opinion, have any permanent disability as a result of this automobile collision? Permanent disability or a permanent impairment to the body as a whole as a result of this?

A. Yeah, we got some abnormal thing on Mr. Porter that cropped up whenever he had the accident. *I don't know if he'll ever—we don't even know if we'll ever make a diagnosis without bone biopsy and a few other things.*

I think since this, he's been referred to an orthopedist. I don't know. *I don't even know what his initial problem is. I don't know. I do know that he's going to hurt in his back or probably will hurt in his back. It may be from the original problem or the exacerbation of the problem. We don't have a diagnosis for Mr. Porter right now.*

I know it seems as though these two people walking around well and had an accident and come up with malignancies, and that's very, very hard, but maybe

that's what has come out of both of them.

*He has abnormal x-rays, which can't be explained totally by the injury. There's something else there.* But how much do you go on a person who, quote, just shows something on x-rays. Can you go in and cut his bone and get biopsies of it? You know, you can't do it.

Q. Attributable to the accident only, what percentage of permanent disability do you allocate, or impairment?

A. Ten percent, five or ten percent. I just don't think Mr. Porter is going to be worth a dime, to be honest with you.

I attempted to treat him on an outpatient basis with muscle relaxants and pain medication, but he during that time exhibited some abnormal back films, and he continued to hurt. We put him in the hospital. He also exhibited straight leg raising as though a pinched nerve was present. We put him in the hospital to make sure he didn't have a disk rupture. So we hospitalized him like a week or so after the accident.

Q. What did your initial examination reveal?

A. He had a straight leg raising test. He had increased pain sypmtoms [sic], mainly in his back, somewhat in his neck. The straight leg raising was the most difinitive [sic] thing we came up with, and that means that there's nerve irritation or could have been a disk.

But we also had outpatient x-rays on Mr. Porter which showed some abnormalities, quite a bit of abnormality really. Even to the extent that we had to get bone scans, the whole bit, to make sure he didn't have something related to the acident [sic]. We also thought that he could have had cancer in the bone.

Q. What was Mr. Porter's condition prior to the accident as far as the skeletal system was concerned?

A. He had no symptoms referable to his back or anything else. He was entirely well. He had had some lung problems because I had followed him, but he had had no problems to the extent that we would ever think he had any back pain or anything. In fact, he had worked until recently, and been totally asymptomatic, to be honest with you.

Q. So how did this automobile accident and injury he sustained in that affect his skeletal system?

A. You said how?

Q. Yes.

A. Well, with Mr. Porter having all the increased activity throughout his spine and everything, *we ruled out malignancy, but we still think it could be Paget's* —the x-ray man thought so, even with the bone scan, CT scan.

MR. ESTES: Could be what?

A. Paget's disease, which is almost like a tumor or benign like tumor of the bone. *Any injury could exacerbate that or it could be non-healing.* It might be quite chronic. Because of the hardening of it, I don't know if all x-rays—x-rays wouldn't reveal anything with him. If he has that kind of film, we have to go to bone scans, actually, to see what's wrong with him, because you couldn't see a fracture on x-ray.

Q. What did the bone scans reveal?

A. Increased activity throughout the lumbar spine and find suggested metastatic disease could account for this finding. *So we still don't know what's wrong with him. Arthritis could account for a hot spine, too. Injury could account for a hot spine. There are so many things. We don't know what's wrong with Mr. Porter, even to today.* [emphasis supplied]

In regard to Mae Katherine Porter, Dr. McGriff testified regarding permanent disability as follows:

QUESTION BY MR. HARSH: In your professional medical opinion, Dr. McGriff, will Mrs. Mary [sic] Katherine Porter sustain any permanent disability as a result of the injury she sustained in this automobile collision of 6–29–85, impairment, as well?

A. I would think that she will have some impairment to some degree because of her age, because of exacerbation. *I don't know whether she'll ever get over it completely.* She has made moderate improvement, but her arm *probably* will be a chronic problem, and *I'm almost sure she has some chronic problem with her back to some degree. I don't know.*[1]

 Where a physician testifies concerning the physical condition, his opinion must be reasonably certain both as to the cause of the physical condition and its future effects.

It is a well known rule of evidence a judgment cannot be based on conjecture; speculation or surmise, and in the case of *Nashville, C. & S.L.Ry. v. Reeves,* 25 Tenn.App. 359, 157 S.W.2d 851, the Court quoted with approval the following from Corpus Juris Secundum and American Jurisprudence:

" 'Testimony of a physician as to the probable effect of the injury is admissible, but it should show that such result is reasonably certain and not a mere likelihood or possibility.' 25 C.J.S. Damages § 149, pp. 799, 800; 17 C.J. 1035, sec. 329.

" 'To warrant a recovery for a permanent injury, the future effect of the injury must be shown with reasonable certainty. It is not necessary that the evidence show conclusively or without a shadow of doubt that the injuries are permanent. But while absolute certainty should not be required, a mere conjecture, or even a probability, does not warrant the giving of damages for future disability which may never exist.' 15 Am.Jur. 486, §§ 75." [*Maryland Casualty Co. v. Young*] 211 Tenn. [1, at] 5, 6, 362 S.W.2d [241, at] 243 [1962].

Testimony of experts as to the probable cause of injury should be subject to the same rules as applied supra in the case of probable effect of injury.

*Reserve Life Insurance Co. v. Whittemore,* 59 Tenn.App. 495, 512–13, 442 S.W 2d 266, 274 (1969).

"A doctor's testimony that a certain thing is *possible* is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a possible cause...." "The mere possibility of a causal relationship, without more, is insufficient to qualify as an admissible expert opinion."

*Lindsey v. Miami Development Corp.,* 689 S.W.2d 856, 862 (Tenn.1985) (citations omitted).

In *Owen Illinois, Inc. v. Lane,* 576 S.W. 2d 348, 350 (Tenn.1978), the doctor's testimony that permanent injury was "just a possibility" was held to be insufficient. In *Aetna Casualty & Surety Co. v. Long,* 569 S.W.2d 444, 446 (Tenn.1978), testimony that the injury "could have been caused" was held to be insufficient. And in *Knoxville Poultry & Egg Co. v. Robinson,* 477 S.W. 2d 515, 517 (Tenn.1972), testimony that the causal connection was "possible" was insufficient.

 Dr. McGriff did testify that Mr. Porter would have a disability attributable to the accident of "ten percent, five or ten percent." However, he also testified that they didn't know whether they would ever be able to make a diagnosis without a bone biopsy and a few other things, which had not been done. He testified that he did not know what Mr. Porter's initial problem was. He testified that he would "probably" hurt in his back. He also testified that he felt it could be "Paget's Disease" and "[w]e don't know what's wrong with Mr. Porter, even to today."

As to Mrs. Porter, he stated that he felt that she would have some impairment be-

---

1. Mae Katherine Porter died approximately ten months subsequent to the accident as a result of throat cancer unrelated to the accident.

cause of her age, but "I don't know whether she'll ever get over it completely" and that "her arm *probably* will be a chronic problem," and further, "I'm almost sure she has some chronic problem with her back to some degree. I don't know."

Dr. McGriff's testimony as to both Mr. and Mrs. Porter, is speculative and conjectural and the jury cannot be allowed to embark upon an inquiry of permanent injury with speculative, conjectural, and equivocal testimony. To do so would allow them to delve into the realm of speculation and conjecture.

The injuries complained of by both Mr. and Mrs. Porter are not injuries that are so obvious that a layman could testify as to their permanency. The permanency of these types of injuries "is peculiarly within the realm of scientific knowledge" and expert medical testimony is required. *Owens Illinois, Inc. v. Lane,* 576 S.W.2d 348, 350 (Tenn.1978).

There was no medical testimony in regard to either Mr. or Mrs. Porter's injuries, other than Dr. McGriff.

It was error for the trial court to submit the issue of permanent injury to the jury as to Mr. and Mrs. Porter.

■ We next discuss whether or not the trial court erred in allowing Dr. McGriff to testify to matters communicated by plaintiffs to Dr. Ruark and also to testify from the notes made by Dr. Ruark as to his diagnosis of the plaintiffs.

Each plaintiff was seen in the emergency room shortly after the June 29 accident by Dr. Ruark. Dr. Ruark took a history from each plaintiff, wrote up that history, and also made a diagnosis of each plaintiff. Dr. Ruark did not testify at trial. However, Dr. McGriff, who had been furnished Dr. Ruark's emergency-room notes, used these notes in arriving at his diagnosis of the plaintiffs.

Dr. McGriff saw and treated Betty Jo Sweat on July 3. She had a tender neck at that time. The muscles of her neck "were tight and rigid." He treated her "with muscle relaxant and pain pills." He diagnosed her as having "a whiplash syndrome." From a reading of the record, it is clear that he based his diagnosis in part upon the report of Dr. Ruark.

The record is clear that in the cases of both Mr. and Mrs. Porter, Dr. McGriff treated them and that he based his diagnosis in part upon Dr. Ruark's report.

In *New Jersey Zinc Co. v. Cole,* 532 S.W.2d 246, 250–51 (Tenn.1975), our Supreme Court adopted the rule:

[T]hat the diagnosis and/or expert opinion of an attending physician is admissible, although based in part upon reports of other doctors or hospital technicians who are not called as witnesses, if said reports are used in the diagnosis or treatment of the patient.

The reason for this rule, which may be the minority rule, is well stated in *State Realty Co. v. Ligon,* 218 Ala. 541, 119 So. 672 (1929):

"... The law recognizes that, in the practice of medicine, a diagnosis of the ailment may include a personal examination of the patient by all the methods known to science, and also the history of the case, as given by the patient or other examining physicians.

This history may include a statement of present and past symptoms, the incidents connected with the beginning of the trouble, such as injury by accident, and the findings of other physicians, such as X-ray examination and blood tests. A professional opinion as to the nature, cause, and extent of the ailment, based upon all these matters in connection with and as part of the personal examination of the patient, is competent evidence. Necessarily the information coming to the physician may be largely hearsay. An exception is made because of the necessities of medical science, because the patient's statements are presumed to be made to aid a correct diagnosis and cure, and the professional reports of physicians

and nurses with the same end in view." 119 So. at 674.

Dr. McGriff's testimony based on the reports from Dr. Ruark was hearsay. However, it comes within the exception and is admissible. This issue is without merit.

We discuss the defendant's last issue of "[w]hether the verdicts are in excess of the range of reasonableness entitling defendant to a new trial or to a remittitur" only as it relates to plaintiff, Betty Jo Sweat in view of the disposition under the first issue as to Charlie Porter individually and Charlie Porter as executor of the estate of Mae Katherine Porter.

In personal injury cases the amount of compensation is primarily for the jury and, next to the jury, the most competent person to pass on the matter is the trial judge. *Foster v. AmCon International, Inc.,* 621 S.W.2d 142, 147 (Tenn.1981).

In jury cases both the jury and the trial court see and hear the witnesses and observe their manner and demeanor. The trial judge by his training and experience is especially qualified to consider any errors that the jury might have fallen into.

In this instance the trial judge reviewed the jury's verdict and found it not to be excessive. He determined that the jury had not fallen into error.

On appeal it becomes our "duty to review the proof of damage" and if we find the damages to be excessive, to reduce them. "But when the trial judge has approved the verdict, the review in the Court of Appeals is subject to the rule that if there is any material evidence to support the award, it should not be disturbed." *Foster,* 621 S.W.2d at 146 (quoting *Ellis v. White Freightliner Corp.,* 603 S.W.2d 125, 129 (Tenn.1980)).

To determine if a verdict as approved by the trial court is excessive, many factors must be looked to, including but not limited to the nature and extent of the injury, the suffering, medical expenses, etc. *Loftis v. Finch,* 491 S.W.2d 370, 377 (Tenn.App. 1972).

We are of the opinion after reviewing the record that there is material evidence to support the judgment, considering all the factors.

Betty Jo Sweat is a severely mentally retarded young woman with the mentality of a six or seven year old. She incurred medical expenses in excess of $300. She suffered a "whiplash" and, to ease the pain of this injury, it was necessary that she take pain pills and muscle relaxants for a period of time. It was necessary that she wear a cervical collar for some two or three months.

While she was unable to testify because of her mental disability, the jury saw and heard family members describe her medical condition as it related to the accident and received the medical proof through Dr. McGriff.

We are of the opinion that there is material evidence to support the verdict and that the verdict as approved by the trial judge is not excessive.

The judgment as to Betty Jo Sweat is affirmed. The judgment entered as to Charlie Porter individually and Charlie Porter as executor of the estate of Mae Katherine Porter is reversed and the cause is remanded to the trial court for a new trial as to all issues. Costs of this appeal are taxed one-half to defendant and one-half to plaintiff, Charlie Porter individually and Charlie Porter as executor of the estate of Mae Katherine Porter.

TODD, P.J., and KOCH, J., concur.