IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 12, 2000 Session

## JOHN L. POINTER, ET AL. v. TENNESSEE EQUITY CAPITAL CORPORATION ET AL.

Appeal from the Chancery Court for Davidson County
No. 90-1607-II(III)     Ellen Hobbs Lyle, Chancellor

No. M1999-01934-COA-R3-CV - Filed December 18, 2001

A now defunct company and its owner sued a former creditor on the basis the creditor's control and management of the company damaged it so that it was no longer a profitable business, causing the stock to lose value. The trial court granted summary judgment to the defendants because the only competent evidence established that the company was never profitable and that no action by the defendants caused the demise of the company. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded.**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

Adrian H. Altshuler, Charles G. Blackard, III, Brentwood, Tennessee, for the appellants, John L. Pointer, Victoria Pointer, and Pointer Oil Company, Inc.

C. Bennett Harrison, Jr., J. Frank Rudy, Jr., Robert M. Garfinkle, Nashville, Tennessee, for the appellees, Tennessee Equity Capital Corporation and Walter Cohen.

**OPINION**

A bankrupt oil brokerage business and its owners sued a secured creditor for fraud, breach of duty of good faith and fair dealing, negligence, breach of fiduciary duty, and tortious interference with business relations. The relationship between the plaintiff business, Pointer Oil Company, Inc. ("Pointer Oil"), and the defendant former creditor company, Tennessee Equity Capital Corporation ("TECC"), involved more than a simple loan arrangement. Plaintiffs, Pointer Oil and its owners Mr. & Mrs. Pointer, claim that TECC and its owner, Walter Cohen,[1] exercised dominion and control over

_____

[1]Mr. Cohen died during the pendency of this litigation in the trial court. His estate continued to participate, principally adopting the positions of SBA as receiver for TECC.

Pointer Oil, excluding its sole common stockholder from management, and damaged it so that it was no longer a profitable business, causing the stock to lose value.

All the damages claimed by the Pointers arise from the nonprofitability and eventual demise of Pointer Oil.[2] The trial court granted summary judgment to Mr. Cohen and TECC because it found the only competent evidence in the record established that Pointer Oil was never profitable and because there was no proof that TECC or Mr. Cohen was the cause of Pointer Oil's financial problems.

## I.

On appeal, summary judgments enjoy no presumption of correctness. *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997); *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 894 (Tenn. 1996). Accordingly, the appellate court must make a fresh determination of whether the movant has met the requirements of Tenn. R. Civ. P. 56. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). We review summary judgment evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997); *Mike v. Po Group, Inc.*, 937 S.W.2d 790, 792 (Tenn. 1996).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995); *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993).

Thus, we will affirm the grant of summary judgment only if the undisputed facts reasonably support one conclusion - that Mr. Cohen and TECC were entitled to a judgment as a matter of law. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell*, 900 S.W.2d at 26.

## II.

Because the Pointers assert that the failure of Pointer Oil to make a profit and to remain viable was due to actions by Mr. Cohen and TECC, it is necessary to review the history of that relationship. Mr. Pointer formed Pointer Oil Company in February 1987 with the intent that it operate as a petroleum brokerage business. Mr. Pointer's only prior experience in the petroleum brokerage business was a 16 week unpaid apprenticeship with a Canadian petroleum company.

Mr. Pointer contributed no personal capital to the business. He spent time trying to obtain

---

[2]They claim damage to value of the common stock of Pointer Oil, exposure of the Pointers to potential individual liability under a guaranty, denial of compensation to the Pointers which required them to incur personal debt, and subjecting them to ridicule and embarrassment as well as emotional distress.

outside financing. After numerous unsuccessful attempts to obtain financing elsewhere, in July 1987, Mr. Pointer contacted Defendant, Walter Cohen, an officer of Tennessee Equity Capital Corporation, a federally licensed minority enterprise small business investment company,[3] about obtaining financing for Pointer Oil. Shortly thereafter, the parties entered into an arrangement which provided Pointer Oil with $250,000 which TECC financed with the Small Business Administration (SBA).

The arrangement included several documents, including a Security Agreement, Financing Agreement, and Put and Call Agreement. In return for the $250,000, TECC received 1,000 non-voting shares of Pointer Oil preferred stock (all the preferred stock). Mr. Pointer owned all common voting shares in the corporation, apparently also 1000 shares.

TECC was to receive a quarterly payment, described as a dividend, at a fixed rate (14%). The security agreement authorized TECC, in the event of default of any payment or dividend or return of capital when due by Pointer Oil, to transfer the common stock into its own name and exercise all rights and privileges enjoyed by the holder of record. Under the arrangement, at any time after five years and one day from execution of the agreement, TECC could put its preferred stock to Pointer Oil, which would be obligated to repurchase, or redeem, TECC's preferred stock at its purchase price plus any unpaid dividends. TECC was also given the right to purchase 49% of the common shares of Pointer Oil after five years and one day for a specified purchase price.

In July 1988, Mr. Pointer began obtaining government contracts for the sale of petroleum products for Pointer Oil through a bidding process which encouraged participation by minority businesses. He handled purchases from suppliers and oversaw delivery, but continued to work full-time at another job while operating Pointer Oil. TECC provided Pointer Oil office space, telephone service, and a part-time administrative staff. TECC staff performed administrative functions including billing, collecting, and scheduling deliveries. Some percentage of those staff members' salaries were paid with funds from Pointer Oil's operating funds.

The Pointers allege that during this time TECC, through Mr. Cohen began to exercise more management control over Pointer Oil. Plaintiffs describe it as TECC controlling the company. Mr. Pointer testified that he resented TECC's control over his company, particularly Mr. Cohen's refusal to allow Pointer Oil to pay him a salary. In Mr. Pointer's view, Mr. Cohen was preventing him from running the company as he saw fit. In his deposition, Mr. Pointer states he was denied access to company records, including information on its financial status, and that some checks were written on the company's account without his approval.

In the late fall of 1998 Mr. Pointer's dissatisfaction with Mr. Cohen led him to contact the SBA. At least partly because of communications and advice from SBA, Mr. Pointer signed fewer documents and appeared less frequently at Pointer Oil's offices, essentially decreasing his involvement.

---

[3]Such entities are licensed under Section 301(d) of the Small Business Investment Act.

Pointer Oil apparently made only two dividend payments to TECC.[4]  On April 24, 1990, TECC demanded payment of all past due dividends. Six days later, TECC declared Pointer Oil in default and took control of Pointer Oil, paying itself $142,953 from Pointer Oil to redeem its stock.

In early May, Mr. Pointer severed ties with TECC, "took control," and began to operate Pointer Oil independently of TECC or Mr. Cohen.  On May 2, 1990, Mr. and Mrs. Pointer and Pointer Oil (collectively the Pointers) filed the underlying action, alleging fraud, breach of the duty of good faith and fair dealing, negligence, breach of fiduciary duty, and tortious interference with business relations, seeking $1,000,000 in compensatory damages.[5]

Mr. Pointer operated Pointer Oil for another eleven months without assistance, or as Mr. Pointer would term it, interference, from Mr. Cohen or TECC.  Mr. Pointer began to pay himself a salary and gave himself two raises.  He added his wife and brother to the payroll and gave them bonuses.  Pointer Oil incurred costs for rent and telephone services previously furnished by TECC.  Pointer Oil purchased an automobile, a Cadillac.  Prior to Pointer Oil's disassociation with TECC, office expenses averaged less than $1500 per month; after that change, they averaged $18,000 per month.

Pointer Oil filed for Chapter 7 bankruptcy protection in May 1991.[6]  TECC filed an unsecured claim for $178,286 in the bankruptcy case which was disallowed in June 1992.  The filing of the bankruptcy petition resulted in an automatic stay of proceedings in the trial court.

## A.  The Tax Refund Issue

Shortly after the initiation of this litigation, TECC filed a Third Party Complaint against the State Commissioner of Revenue claiming an interest in a refund for petroleum taxes due Pointer Oil and being held by the State.  The State responded by interpleading the petroleum tax refunds. Plaintiffs filed a motion for disbursement of the funds.  TECC responded by asserting status as a secured creditor and its concern that the Pointers would dissipate the funds if disbursed to them. TECC asserted the court should allow the Commissioner to deposit the funds with the court subject to disbursal after trial.

In his interpleader complaint, the Commissioner of Revenue stated that he had in his possession "funds made payable to Pointer Oil Company, Inc., in the amount of $50,141.41 for refunds of petroleum taxes . . . as claimed on its Governmental Refund Claim forms dated June 26,

---

[4]SBA's expert stated that Pointer Oil paid TECC dividends totaling $19,834.34.

[5]TECC and Mr. Cohen answered and counterclaimed, alleging fraud and interference with business relations. TECC counterclaimed for all amounts due under various agreements with the plaintiffs.  The Pointers answered the counterclaim asserting defenses of waiver, lack of subject matter jurisdiction, fraud and duress.

[6]The transcript of some of Mr. Pointer's testimony in the bankruptcy proceedings is included in the record.

4

1990 and July 20, 1990." The Commissioner expressed his belief that, based on past experience with Pointer Oil, future refund claims would be filed and future refunds would likely be owing.

The interpleaded funds were eventually paid by the State to the bankruptcy trustee. An order was entered herein evidencing agreement by the parties to that resolution. The court acknowledged the automatic stay, but allowed the Commissioner to make such payments, with agreement of the bankruptcy trustee, and to be dismissed from the proceedings herein. By the time the order was entered, June 6, 1991, the total amount of tax refunds due Pointer Oil and held by the Commissioner had reached $388,003.85. Entitlement to the funds was left to be determined in the appropriate forum.

The fact that Pointer Oil was entitled to tax refunds from the State is relevant to an argument made by the Pointers regarding the profitability of Pointer Oil. Because Pointer Oil sold to governmental entities, its sales were apparently subject to no tax. Although much is made of this argument, no one has cited us to the appropriate authority explaining the basis or the amount for this tax break. However, because the State affirmed that Pointer Oil was entitled to rebate of taxes it paid on sales to governmental entities, we conclude such tax advantage existed and was realized through application for rebate of taxes already paid.

## B. The Consolidated Case

In March 1991, Sprague Energy Company, one of Pointer Oil's bulk petroleum suppliers, sued Pointer Oil, Mr. and Mrs. Pointer, TECC, and the Commissioner for Revenue for the State of Tennessee. The complaint alleged that Pointer Oil had not paid for $692,288 in oil it purchased on open account under a security agreement with Sprague Energy and sold to the state. The complaint alleged that the open account arrangement began in February of 1990 and that Pointer Oil began to become delinquent in its payments during the middle part of 1990. In October 1990, Sprague and Pointer entered into an Assignment and Security Agreement in which Pointer Oil assigned, as security collateral, all its rights in its present and future accounts receivable as well as all payments due or to become due. Sprague alleged that the delinquencies continued to mount, however, and Sprague ceased sales to Pointer Oil in January of 1991. The complaint alleged that as of March 11, 1991, Pointer Oil owed Sprague Energy $692,288.68.

Sprague claimed a superior interest to any tax refunds being held by the state and asked that the Commissioner of Revenue be enjoined from distributing any refunds to either Pointer Oil or TECC until Sprague's rights were determined. Sprague's action was consolidated with the action initiated by the Pointers in May 1990. The order allowing the Commissioner to pay accumulated tax refunds to the bankruptcy trustee was approved by counsel for Sprague.

## C. The SBA Receivership

As the relations between the parties deteriorated in the fall of 1989, Mr. Pointer contacted the SBA and provided them with financial documents from Pointer Oil, which eventually led to a

5

federal receivership action against TECC. In March of 1992, the U.S. District Court for the Middle District of Tennessee entered an order taking exclusive jurisdiction of TECC, appointing the SBA as receiver of TECC, dismissed officers of TECC, enjoining all parties to any civil actions involving TECC from taking further action in any such proceeding, and staying all other civil legal proceedings involving TECC or its assets.[7]

The parties herein agree that the receivership action arose at least partly because TECC's involvement in Pointer Oil (and apparently other companies) violated SBA regulations. The Pointers cite 13 C.F.R. 107.801, Restricted Activities: Control of Small Concern, as prohibiting entities licensed as minority enterprise small business investment companies from assuming control over small businesses by "management agreements, voting trusts, majority representation on the board of directors or otherwise." They assert the receivership action resulted from violation of various federal regulations including providing funds to small business concerns controlled by TECC. SBA as receiver for TECC acknowledges that "TECC's exercise of control violated SBA regulations and was one of the reasons TECC was put in a Federal Receivership." [8]

### D. The Bankruptcy

As noted above, Pointer Oil filed a Chapter 7 petition in Bankruptcy Court. TECC filed an unsecured claim for $178,286.38. Sprague Energy and the trustee objected to the claim. The bankruptcy court was called upon to determine priority among creditors to the remaining assets of

---

[7]Activity in this litigation resumed in 1998 after an agreed order was filed in the federal receivership action to allow this case to go forward. After the federal court's appointment of a receiver, all pleadings were filed by SBA as receiver for TECC.

[8]The record includes the deposition of the director of the office of liquidation for the SBA. He was involved in the liquidation of TECC. He testified that the receivership action was instituted in part because TECC had improperly taken control of a number of portfolio concerns. In some instances that was done by use of a pawn or strawman. Specifically with regard to Pointer Oil, the SBA witness testified, "I don't think the record establishes that Walter Cohen was operating or running Pointer Oil Company. And I didn't regard John Pointer as a pawn or a front man for Walter Cohen." The witness later clarified that if it were proved that TECC controlled Pointer Oil's money, that might be an indicator of control. However, he stated it was not unusual or improper for a small business investment company to place negative covenants or restrictions on operational expenditures by a small business entity as part of the initial financing. Precision in defining the exact nature and basis of the federal court's determination in the receivership action is not necessary for a determination of the issue before us. The factual issue of control would likely have to be decided in this action if summary judgment on causation and damages is not upheld.

Mr. Cohen was indicted and convicted in federal court. The Pointers state this conviction was "due to among other things fraud on various portfolio companies." SBA states that the Pointers "correctly and frequently point out in their brief that Walter Cohen violated federal statutes and was subsequently found guilty of criminal conduct." However, SBA also points out that the criminal prosecution was related to various companies and, therefore, not in any way specific to Pointer Oil. The SBA's director of the office of liquidation testified that he recalled that the criminal charges included filing false statements with the federal government and taking improper control of portfolio concerns and that Mr. Cohen was convicted of filing, and conspiring to file, false statements.

Pointer Oil, primarily the tax refund from the state. The court held that TECC's actions in paying itself $142,953.11 from Pointer Oil funds on May 3, 1990, could have amounted to a preferential transfer or a fraudulent conveyance. The court held that TECC's taking of the funds ahead of other unsecured creditors was inappropriate and disallowed TECC's claim. In addition, the court found "The evidence presented indicates that Pointer Oil Company was insolvent or was rendered insolvent in May of 1990."

III.

Pointer Oil claims that TECC harmfully exercised dominion and control over Pointer Oil and excluded management, i.e., the president and sole common shareholder, Mr. Pointer, thereby causing irreparable damage to Pointer Oil and causing the stock to lose its value.[9] In response, SBA as receiver for TECC claims in the motion for summary judgment that Pointer Oil can show nothing that TECC did to harm the financial condition of Pointer Oil and that recovery of damages for lost value to stock is impermissible because Pointer Oil is unable to prove profitability.

In support of the motion for summary judgment, receiver SBA provided, among other filings, affidavits of an expert witnesses, Mr. H. David Smith, a CPA with experience in evaluation of closely held businesses. Mr. Smith examined Pointer Oil's records of actual operations. He reviewed specific petroleum sales including the cost of the product, the amount billed, the taxes involved and the freight. Mr. Smith opined that it was the underpricing of sales contracts, not any action by Mr. Cohen or TECC, which caused Pointer Oil's demise.

The trial court in this case analyzed the expert evidence and specifically found that Mr. Smith's opinion was based on review of actual revenue and expenditures of Pointer Oil and found:

> In Mr. Smith's affidavit he carefully goes through the history and financial transactions of POC to trace its demise. He illustrates that POC suffered operating losses in each of its three fiscal years for a total of $106,111.52 during the period in which the administration was under TECC. Mr. Smith reviews various schedules which reflect that the pricing Mr. Pointer came up with on product was insufficient, sometimes not even enough to cover the freight charges, let alone other expenses and overhead. POC could only make money if it sold petroleum products for a price higher than the costs it had to pay its supplier plus delivery and administrative costs.

---

[9]The Pointers set forth five legal theories in the Complaint. Count 1 alleges intentional and reckless misrepresentation and fraud. They assert that the misrepresentations of TECC and Walter Cohen caused them to enter into the financing transaction with TECC. Count 2 asserts that TECC breached the duty of good faith and fair dealing owed in establishing the financing agreement, drafting the documents and in subsequent operation of and dealing with Pointer Oil. Count 3 asserts that TECC committed negligence and negligence *per se* in ignoring federal statutes and regulations prohibiting TECC from exercising dominion and control over the business affairs of Pointer Oil. Count 4 asserts that TECC owed Pointer Oil a strict fiduciary duty of trust and confidence and that TECC breached that duty. Finally, count 5 asserts that TECC acted with malice and in bad faith and tortiously interfered with Pointer Oil's contractual and business relations.

Fluctuation in the price of oil did not affect the margin of the contracts because all bids were based upon a specific markup over the purchase price. It is undisputed that Mr. Pointer was responsible for stating prices through the bidding process.

Additionally, Mr. Smith's affidavit establishes that after Mr. Pointer took over the company following his falling out with TECC the affairs of POC became much worse and expenses increased because Mr. Pointer changed the TECC policy of not compensating Mr. Pointer or his wife, and paid himself and his wife and her brother. Mr. Pointer also awarded his wife and brother a bonus. Mr. Smith concludes that the administrative expenses increased dramatically after Mr. Pointer took over and moved the operation from TECC's office during the 11 months that POC had its office from TECC and under Mr. Pointer's exclusive control, the office expenses averaged $18,000.00 per month or about 20% of gross sales.

The conclusion to be reached from Mr. Smith's testimony is that Pointer Oil was never profitable and that its financial failing was due to underpricing of contracts, a task performed exclusively by Mr. Pointer. In fact, Mr. Smith opined that Mr. Pointer was principally responsible for the losses suffered.

The trial court has aptly summarized Mr. Smith's affidavit. Mr. Smith testified that he had been retained by SBA as receiver for TECC to analyze a claim filed in the receivership action by the Pointers. He described that claim as based upon their assertion that TECC and Mr. Cohen "caused the company's financial demise and the resulting worthlessness of their stock." His task was defined as determining what value Pointer Oil stock had and whether TECC did anything to cause devaluation of that stock.

He examined all the corporate records of Pointer Oil that had been located by SBA and averred that, to his knowledge, no other records existed. Because no financial statements existed, he prepared cash basis earnings statements for the relevant periods using bank statements and canceled checks. On the basis of this work, he calculated that in its first three fiscal years, or parts thereof (from August 1, 1988, to April 30, 1990, the time when TECC was involved),[10] Pointer Oil suffered operating losses totaling $106,111.52. In addition to these operating losses, Pointer Oil paid TECC $19,834.34 in dividends. These losses and dividends were financed with $129,659.88 drawn from the investment account created by the financing from TECC.

Mr. Smith also prepared a cash basis earnings statement for the period of June 1, 1990 to April 17, 1991 (after TECC was no longer involved). The statement reflected a cash loss of approximately $29,000. "Additionally, Mr. Pointer filed schedules with the bankruptcy court in connection with POC's bankruptcy that POC owed its supplier, Sprague Energy, $692,680 and was owed $407,000 by the State of Tennessee for tax refunds at the beginning of May 1991." Mr. Smith concluded that if those figures were included, Pointer Oil suffered a loss of $314,000 for this period.

---

[10]Pointer Oil severed its relationship with TECC in May of 1990.

The following portion of Mr. Smith's affidavit explains his underpricing conclusion:

POC suffered losses over the time of its existence totaling approximately $420,000, which were principally financed by TECC's investment of approximately $110,000, net of the dividends it got back, and the $285,000 insolvency it posted when it filed bankruptcy in May of 1991. The losses in my opinion are the result of underpricing sales. During the period from August 1988 through April 1990, when POC was administered out of TECC's offices and purportedly under Walter Cohen's control, the monthly office expenses averaged less than $1500. Accordingly, the losses suffered during that period had to be in the gross margins. During the approximately ten months that POC had its offices separate from TECC and under Mr. Pointer's control, the monthly office expenses averaged about $18,000 and amounted to approximately 20% of gross sales. The costs of the products plus delivery exceeded the sales prices collected during this period, resulting in substantial losses.

Mr. Smith also examined the deposition of Terry Day who worked in the offices of TECC and handled the day to day administrative duties of Pointer Oil and the attached schedules reflecting details of specific sales, including cost of product, amount billed, taxes involved, and sometimes freight charges.[11] His review of those schedules and Ms. Day's testimony reaffirmed his opinion that the significant losses suffered by Pointer Oil were the result of underpricing of the product it was selling.

It is undisputed that Mr. Pointer established the price in contracts for the sale of petroleum to Pointer Oil's customers. The contracts were cost-plus contracts, meaning that Pointer Oil charged its customers a specified markup over the price Pointer Oil paid to purchase the petroleum from suppliers. As the trial court pointed out, the markup needed to be calculated to cover delivery and other charges as well as Pointer Oil's overhead before any profit would be realized.

IV.

When faced with a motion for summary judgment, Pointer Oil had the burden of producing evidence which contradicted the allegations asserted by TECC in the motion. *Byrd*, 847 S.W.2d at 215. Pointer Oil was required to set forth specific facts, not legal conclusions, by using affidavits or discovery materials that established there were disputed issues that are material to the resolution of the case. *Id.* A disputed fact is material for summary judgment purposes if it must be decided in order to resolve a substantive claim or defense underlying the summary judgment motion. *Id.*

In opposing the motion for summary judgment, the Pointers presented their own expert testimony regarding the damage that TECC caused to Pointer Oil, Mr. Gary L. Atnip, a CPA with eighteen years of experience in general accounting, advisory services, computer consulting and

---

[11]Ms. Day's deposition was filed in support of the motion for summary judgment and is included in the record.

9

litigation support. Essentially, he attempted to estimate the value of the future profitability of Pointer Oil or the profit that Pointer Oil should have earned. He opined that the amount of loss of future profits, from 1990 to 1996, was $3.4 million (before taxes). He opined that Pointer Oil had experienced $500,000 per month in contract revenue growth during the six months prior to its separation from TECC, and was, therefore, capable of profitability. He based his opinion, at least in part, upon the guarantee of a gross profit margin in each sale because of the cost-plus nature of the contracts.

The trial court determined that Mr. Atnip's affidavit did not meet the requirement of competent, admissible evidence to rebut the evidence presented by the party moving for summary judgment. Regarding Mr. Atnip's testimony, the court found:

> The problem with Mr. Atnip's affidavit is that it is not based upon a review of the actual transactions of POC. Mr. Atnip admitted in his deposition that he was not familiar with the actual operating results of POC for 1990, that he had not reviewed cash flow or performed a cash flow analysis of POC. Additionally, Mr. Atnip assumed a gross profit margin of 3% but throughout its entire existence POC never attained a gross profit margin of 3%. Mr. Atnip's opinion also fails to take into account possible loss of customers in spite of the fact that customers, such as the State of Tennessee, the company's single largest account, were lost in 1990. Mr. Atnip

acknowledges in his deposition that he was unaware that the State of Tennessee had terminated POC's contract due to nonperformance and admitted that the loss of this contract would drastically alter his projections for future revenues. Mr. Atnip opined that POC experienced approximately $500,000.00 in annual contract revenue growth per month during the last six months POC operated out of the offices of TECC. Mr. Atnip, however, could not remember how he arrived at this number. Mr. Smith's review of the actual cash revenue of the company does not bear out this assumption. Moreover, Mr. Atnip admitted he had not analyzed Mr. Smith's analysis and had no idea whether it was accurate or not. Mr. Atnip based his opinions on projected expenses and on projected revenue. Mr. Smith, however, based his analysis on actual aggregate cash expenditures of the company.

On appeal, the Pointers object to the trial court's exclusion of Mr. Atnip's testimony. However, we agree with the trial court and find that the exclusion was in accordance with the law of expert testimony.

Admissibility, qualifications, relevancy and competency of expert testimony are questions left to the trial judge and will not be disturbed unless there is a showing the decision is arbitrary or an abuse of discretion. *McDaniel v. CSX Transport, Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)); *State v. Begley*, 956 S.W.2d 471, 475 (Tenn. 1997); *State of Tennessee ex rel. Dep't of Transp., Bureau of Highways v. Brevard*, 545 S.W.2d 431, 436-37 (Tenn. Ct. App. 1976).

It is the duty of a trial court to determine as gatekeeper whether or not opinion evidence will substantially assist the trier of fact and whether or not the underlying opinion is trustworthy.

*McDaniel*, 955 S.W.2d at 265. An expert's opinion cannot be based on speculation, but must be based on reliable data and relevant methods and processes. *Id.* Specifically, "[t]his gatekeeping role . . . is to assure that expert's opinions are based on relevant scientific methods, processes, and data, and not on mere speculation, and that they apply to the facts in issue." *Id.* (quoting *Joiner v. General Elec. Co.*, 78 F.3d 524, 530 (11th Cir. 1996)).

In making this determination, the court relies on Tennessee Rules of Evidence 702 and 703, which govern admissibility of expert testimony. Rule 702 allows opinion testimony from a qualified expert if "scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tennessee departs from the federal rule in that it requires the information "substantially" assist the trier of fact, thereby creating a greater burden on the proponent of the expert opinion. Additionally, Rule 703 states in pertinent part, "The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

Additionally, when calculating damages, expert conclusions cannot be grounded in speculation or guessing. *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F. Supp. 819, 854-55 (M.D. Tenn. 1974). For example, an accountant's calculations must be based on theories and data that have a sound basis in fact and reason. *Id.* at 855. No matter what type of evidence is at issue, the evidence should be derived from "relevant . . . methods, processes, and data, and not upon an expert's mere speculation." *McDaniel*, 955 S.W.2d at 265.

Mr. Atnip admitted in his deposition that his conclusions were based primarily on discussions with Mr. Pointer, some cancelled checks and isolated contracts. From this, he did a cash flow approach to value the business. Without being familiar with the actual operating receipts or expenditures of Pointer Oil, or the extent of its contracts, Mr. Atnip also generated a Proforma Income Statement predicting that Pointer Oil would generate $8,750,000 in gross revenue and earn $265,000 in profit for 1990. However, Mr. Atnip failed to consider that Pointer Oil actually only had $1,261,208 in gross revenues for 1990. Additionally, Mr. Atnip admitted that he was not familiar with the operating costs of the company, failed to conduct a cash flow analysis for the company based on actual transactions made, was unaware of the full extent of contracts that existed and that the largest contract, with the State of Tennessee, had been terminated.[12] He was unable to recall where or how he had come up with the calculations of future profits he had predicted.[13]

---

[12]He admitted in his deposition that loss of this contract would greatly affect the conclusions he had made.

[13]When asked if the $500,000 per month growth in revenue he predicted was based on actual review of contracts in calculating the average monthly increase, he replied he had not sat down and totaled things up to arrive at a number. "I don't remember exactly how I came to that number, if that's something that Mr. Pointer told me or - - I do know I looked at several contracts and there were significant volume levels for those contracts and it was reasonable, in my opinion, to believe that it would have been something like this." When asked again if he could explain how he came up with that number, he replied, "Not specifically, no."

11

The trial court's decision to exclude Mr. Atnip's testimony and opinion of profitability was neither arbitrary nor an abuse of discretion. To the contrary, it was based on well-settled principles and on Mr. Atnip's own statements. Therefore, Mr. Smith's testimony and his opinion that the financial demise and lack of profitability of Pointer Oil were not caused by any conduct of TECC or Mr. Cohen remain unrebutted by expert opinion.

V.

Without Mr. Atnip's testimony, the Pointers must have otherwise rebutted evidence presented in support of the motion for summary judgment, to the extent that a genuine issue of fact remains that is material to whether TECC and Mr. Cohen are entitled to judgment as a matter of law.[14] The issue of whether TECC's conduct caused Pointer Oil's financial collapse is certainly material.

In opposing summary judgment, the Pointers did not dispute the specific examples of underpricing cited by Mr. Smith and Ms. Day; they presented no evidence contradicting the information. Ms. Day testified about specific contracts and particularly pointed out the contract with the State of Tennessee as one in which losses necessarily occurred because the markup over cost from suppliers was so small it did not cover transportation costs. That situation was particularly damaging because of the volume involved. Again, the Pointers have provided no rebuttal to this testimony.

In addition to Mr. Smith's conclusion that Pointer Oil was never profitable, the SBA's director of the office of liquidation testified that "Based on what I know with or without TECC, this company [Pointer Oil] couldn't survive because it had never performed on a cash basis at a profit." When asked to explain that conclusion, the witness stated:

> It always operated at a loss. And after a portion of the $250,000.00 financing from Tennessee Equity had been consumed to cover operating losses or losses on transactions and then debt is accumulating amongst the creditors, be it Sprague Oil or the people that performed the shipping or the people, whatever, rent, whatever the other expense may be, the debt begins to grow. And after Brenda Resha and the others are out, the losses start occurring at a much greater amount as expenses go up.

> This company, when you look at it, the facts providing, is never making money, and there is no reason to believe that under any circumstances a company that is operating in such a manner is going to survive.

Instead of disputing the basic facts underlying the conclusions as to the reason for the

_____

[14]We are not convinced that Mr. Atnip's affidavit provided any rebuttal regarding Mr. Smith's conclusion as to the cause of Pointer Oil's demise, the underpricing of contracts, had the court admitted and considered it. He simply opined Pointer Oil had a volume of contracts with built-in profit margins that were sufficient to make it profitable. He did not review all contracts.

company's nonprofitability, the Pointers first assert that the trial court's statement that Pointer Oil "could only make money if it sold petroleum products for a price higher than the cost it had to pay its suppliers plus delivery and administrative cost" is incorrect. "Because of Mr. Pointer's minority status, POC was provided preferable treatment in the bidding process (i.e. 3% - 5% buffer); and because of Governmental Status of POC purchases, POC would also gain tax rebate funds/credits; all of which if allowed to go to fruition would prove to be profitable for POC." The Pointers argue that Pointer Oil's status as a minority owned enterprise entitled it to preferential treatment in the bidding process. They characterize this preference as a "built-in additional 5% preference over its competitors." For support of this assertion, they point to Mr. Pointer's affidavit in which he states:

> As a member of a disadvantaged minority and as the principal shareholder of Pointer Oil Company, Inc., the company was provided with an advantage in bidding on all of its contracts since the company was allowed a 5% preference on all bids. This resulted in the company being able to maintain at least 3% gross profit margin on all accounts.

We find this statement insufficient to rebut TECC's evidence regarding the cause of Pointer Oils failure to make a profit. While a bidding preference may help a company obtain business, it does not have any effect on the cost to be paid under a contract. While such a preference may allow eligible companies to increase their profit margin and still win a contract even though bidding a higher price, it does not mandate how a company prices its bids. Thus, even if the preference made it possible for Pointer Oil to build in a 3% gross profit margin, there is no proof that the contracts were so structured. The Pointers have failed to provide any evidence of their use of the bidding preference, its effect on profit from any contract, or its benefit or potential benefit, in terms of profitability from contract pricing. Their reference to its availability and general benefits are not sufficient to defeat summary judgment.

They also appear to argue that the refund of taxes on sales to tax-exempt governmental entities provided part of the profit margin. They have, however failed to provide any examples or evidence as to how the tax rebate affected profit margin. The rebates were just that: refunding of taxes already paid. When Pointer Oil bought products from a supplier, it paid the supplier for various taxes, including some imposed by the state. When Pointer Oil sold to governmental entities which were exempt from state taxation, it was eligible for a refund of the taxes it had paid. The Pointers have failed to explain or demonstrate how this refund affected its profitability. In any event, the records of the bankruptcy proceeding show that the total amount of rebates due at that time was less than the amount Pointer Oil owed to one supplier. The Pointers have not demonstrated that the rebates would have made Pointer Oil profitable in spite of the underpricing of contracts.

In addition to disputing the trial court's finding, the Pointers also assert that it was Mr. Cohen's actions which resulted in Pointer Oil's demise and that this assertion creates a genuine issue of material fact. The specific actions they allege are that Mr. Cohen "misappropriated or stole funds" from Pointer Oil and caused the withholding of tax refunds.

The Pointers argue that TECC's actions preventing Pointer Oil from receiving the tax refunds contributed caused its demise. Ms. Day testified that she routinely prepared the tax refund requests that were sent to the state and that she prepared such a request in April of 1990. It was shortly after that Mr. Pointer removed the administrative functions from TECC employees. The Pointers' argument that TECC prevented Pointer Oil from receiving tax refunds appears to stem from the filing in this litigation in which TECC claimed an interest in the money being held by the Commissioner of Revenue. That money, tax refunds due Pointer Oil, was interpleaded into court. The subsequent bankruptcy postponed decision on the rights to that money, and it was eventually transferred to the bankruptcy trustee.

The Pointers claim that the withholding of the tax refunds diminished the cash flow into Pointer Oil, rendering it unable to pay suppliers, the ultimate cause of its demise. Again, however, the Pointers have produced no evidence to support this allegation. They have produced no cash flow analysis or any actual figures. In any event, the withholding of Pointer Oil's tax refunds did not occur until after Mr. Pointer had disassociated Pointer Oil from TECC. In fact, it did not occur until after the Pointers filed this lawsuit. Their complaint was filed in May, and TECC's third party complaint was filed in July. Pointer Oil continued to operate after the funds were interpleaded into court and continued to incur higher operating costs.

Pointer Oil's inability to access the tax refunds was the result of filings in this litigation in which TECC claimed rights to the refunds on the basis of its status as a creditor.[15] It is clear this action took place after TECC was no longer involved in the operation of Pointer Oil. As the Pointers have asserted, the bankruptcy court found that the evidence indicated that Pointer Oil was insolvent in May 1990, which was before TECC filed the claim against the tax refunds. This conclusion is consistent with Mr. Smith's opinion that Pointer Oil was never profitable. In addition, he testified that as of April 1990, Pointer Oil had operating losses of over $106,000 as well as an additional $19,000 in debt repayment. These losses were covered by the money from TECC. We find that the Pointers have not provided sufficient evidence regarding the effect of the withholding of the tax refunds, occurring after July 1990, to create an issue of fact regarding the cause of Pointer Oil's demise.

The Pointers' final argument regarding the viability of Pointer Oil is that TECC's actions in declaring Pointer Oil in default and in withdrawing over $142,000 from Pointer Oil for allegedly due but unpaid dividends damaged Pointer Oil's ability to continue in business. Again, the Pointers have failed to provide facts regarding the impact of this withdrawal. Other testimony indicates that it was the loan from TECC which had covered operating losses, and the Pointers do not explain the impact of the company's idebtedness on its financial future. They rely heavily on statements in the bankruptcy court's order denying TECC's claim in the bankruptcy proceeding wherein that court denied TECC's claim for $178,286.38. Relevant to the issues herein are the following excerpts:

---

[15]We question whether such filing could amount to the kind of conduct which would support liability under the causes of action alleged by the Pointers.

. . . even if TECC accomplished a partial redemption of its stock on May 3, 1990, there is a substantial likelihood that Pointer Oil Company is entitled to recover the $143,000 that TECC paid itself from the corporate treasury of Pointer Oil under §§ 544, 547 or 548 of the Bankruptcy Code. The evidence presented indicates that Pointer Oil was insolvent or was rendered insolvent in May of 1990. It is more likely than not that the transfers of cash from Pointer oil to TECC in May 1990 were preferential or fraudulent conveyances or constituted outright theft of the assets of Pointer Oil. The trustee appears to have rights of recovery from TECC with respect to the $143,000 it took from the debtor in May of 1990. These rights preclude allowance of TECC's claim under § 502.

We do not agree with the Pointers as to the conclusions to be drawn from these statements. They simply indicate the bankruptcy court's findings, applying bankruptcy law, regarding the inclusion of the $143,000 withdrawal in the bankrupt's assets subject to distribution to creditors. The court stated that since Pointer Oil was insolvent, the transfer was preferential or fraudulent under bankruptcy law. Such is the case when money is removed so that a rightful party, a creditor with priority, is deprived of it. At the time of the bankruptcy court's order, the issue was not whether Pointer Oil was entitled to the $143,000; the question was which of its creditors was entitled to it. Nothing in the bankruptcy court's order, relied upon by the Pointers, supports their argument that TECC's withdrawal of money was the cause of Pointer Oil's lack of profitability or its demise. The bankruptcy court's findings on the question then before it do not alter the fact that the Pointers failed to show that, absent the preferential transfer, Pointer Oil would have remained viable. Nothing in the court's findings indicate that Pointer Oil was otherwise viable.

VI.

Accordingly, we conclude that Pointer Oil failed to rebut TECC's proof that Pointer Oil was not profitable and that there was no causal connection between Pointer Oil's demise and any action by TECC. "The evidence of the non-moving party must show more than a mere metaphysical doubt as to material facts, but must include competent and material evidence of the nonexistence of facts asserted by the moving party and/or other facts which effectively disentitle the moving party to summary judgment." *Caldwell v. Nissan Motor Manufacturing Corp., U.S.A.*, 968 S.W.2d 863, 865 (Tenn. Ct. App. 1998), (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). It is well settled that "[t]estimony which amounts to mere speculation is not evidence which establishes proximate cause." *Primm v. Wickes Lumber Co.*, 845 S.W.2d 768, 771 (Tenn. Ct. App. 1992) (*perm. app. denied* Nov. 23, 1992) (citing *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861-62 (Tenn. 1985); *Porter v. Green*, 745 S.W.2d 874, 877-78 (Tenn. Ct. App. 1987)). Subjective belief and speculation are insufficient to create the requisite casual connection. *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999) (wrongful discharge).

According to Mr. Smith's testimony, the cause of Pointer Oil's inability to earn a profit was the underpricing of the sales contract, which undisputedly was handled solely by Mr. Pointer. The

Pointers have failed to establish any evidence of a causal connection between any action of Defendants and the eventual demise of Pointer Oil. Without such causal connection, TECC and Mr. Pointer cannot be liable for any consequences of that lack of profitability and demise. Therefore, summary judgment was appropriate.

For the reasons stated herein, we affirm the trial court's grant of summary judgment. This cause is remanded for any further actions which may be necessary. Costs of this appeal are taxed to Appellants, John L. Pointer, Victoria Pointer, and Pointer Oil Co., Inc., for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE