IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 16, 2013 Session

**JOHNNY PYLE  v. BETTY MULLINS**

**Appeal from the Circuit Court for Knox County**
**No. 1-197-11      Dale C. Workman, Judge**

_____

**No. E2012-02502-COA-R3-CV-FILED-NOVEMBER 25, 2013**

_____

Johnny Pyle sued Betty Mullins for personal injuries sustained in a three-vehicle accident.[1] Mullins admitted liability.  The issue of damages was tried to a jury.  At the close of the proof, the jury returned a verdict awarding Pyle $15,000 in compensatory damages.  The trial court, in its role as the thirteenth juror, affirmed the verdict.  Pyle appeals.  He claims the verdict should be set aside because of a lack of material evidence to support the verdict, erroneous evidentiary rulings, and the failure of the court to instruct the jury regarding a pre-existing condition.  On our review, we conclude that there is no reversible error. Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, J., and NORMA MCGEE OGLE, SP. J., joined.

Donna Keene Holt, Knoxville, Tennessee, for the appellant, Johnny Pyle.

Brian H. Trammell, Knoxville, Tennessee, for the appellee, Betty Mullins.

---

[1]The driver of the third vehicle involved in the accident is not a party to this appeal.

# OPINION

## I.

The basic facts in this case are essentially undisputed. This accident occurred on October 28, 2010, at the intersection of Kingston Pike and Campbell Station Road in Farragut. Pyle, operating a Toyota pickup truck pulling a trailer with lawn equipment in it, was stopped behind another vehicle at a traffic light. Mullins was driving a Lincoln sedan. She struck the rear of Pyle's trailer, thereby forcing Pyle's truck into the car ahead of him. Pyle was taken from the scene to the hospital by ambulance. After being x-rayed, he was diagnosed with a cervical strain and released. A week after the accident, Pyle, a landscaper, began chiropractic treatment for his complaints of continued neck and back pain.

In September 2011, Pyle sued Mullins for negligence. Pyle sought $75,000 in compensatory damages for his pain and suffering, past and future medical expenses and other damages stemming from the "serious and painful bodily injuries" he allegedly sustained in the accident. As previously noted, Mullins admitted liability. The sole question going forward pertained to the issue of compensatory damages.

At the time of the July 2012 trial, Pyle, then 51, continued to work in his landscaping and mowing business. He testified he had worked as a contract laborer since he was a teenager and had never had any health problems before the accident. Pyle conceded that, during discovery, he forgot to state that he was involved in another accident on September 17, 2010, in which a car struck the side of a different trailer he was pulling. Pyle said he suffered no injuries and never sought any treatment in the earlier accident.

Trooper Kevin Stroup of the Tennessee Highway Patrol investigated both accidents. Regarding the Mullins/Pyle accident, he observed damage to the trailer Pyle was pulling, to the back and front of his truck, and to the rear of the car that was stopped in front of Pyle. He saw scuffs and scratches on the front of Mullins' car that correlated with the damage to Pyle's trailer. He did not observe the same scratches and marks when shown a photograph of Mullins' car purportedly taken after it was washed following the accident. In his report, Stroup estimated damages of over $400 to all three cars. Stroup testified that he was also called to the scene of the earlier wreck involving Pyle. There were no injuries, but the vehicle that struck Pyle sustained disabling damage.

Mullins, 74, testified she did not know how the accident happened – she pushed the brake and then struck Pyle. Mullins said there was little visible damage to her car. She continued to drive it and decided not to have the estimated $904 in damages repaired. Mullins was uninjured. The impact did not cause her car's front air bags to deploy. Contrary

-2-

to Pyle's testimony, Mullins said she approached Pyle after the accident to ask if he was okay, to which he replied, "I think so." Mullins agreed there were four vertical scratches to the front of her car that matched the bars on the back gate of Pyle's trailer. She acknowledged her deposition testimony to the effect that she saw the gate of the trailer was bent in. She added that she knew her car had made contact with the bottom of the trailer, but said,

> that's all I saw. I couldn't see that much damage. There was nothing on the ground, nothing broken. . . .

Mullins admitted that on the day of the accident with Pyle, she learned about his September 17 accident as a result of a conversation between the driver of the third vehicle and Trooper Stroup. She admitted she did not mention her knowledge of Pyle's accident in answer to an interrogatory which asked her to identify anyone she talked to about the accident at the scene or thereafter and to state "all you remember about such conversation."

Kendal Hicks, Pyle's employee, testified that before the accident, Pyle worked in the lawn business "like a 25-year-old man." After the accident, Pyle could "hardly get in and out of the truck." John Tindell, a friend of Pyle, testified that he also owned a lawn business and had helped Pyle in the months after the accident. He had seen a decrease in Pyle's ability to do the required physical work.

Dr. Chad Jacobs, a chiropractor, first saw Pyle on November 4, 2010. Pyle complained of being in constant pain since the accident with Mullins. He suffered from neck, arm, shoulder and back pain, sleep difficulty, headaches, and stiffness. On examining him, Dr. Jacobs found that, in addition to daily headaches, Pyle had severe restrictions as to his range of motion in his neck and difficulty bringing his hand away from his body. X-rays showed the main problem was a decrease in the cervical curve. Jacobs diagnosed Pyle with cervical, thoracic, and lumbar shoulder sprain or strain. In 25 sessions over the course of ten weeks, Dr. Jacobs performed adjustments to Pyle's spine in an effort to return his cervical curve to its pre-accident condition. He used traction, and applied muscle stimulation. Pyle's intensity of pain decreased and, in many areas, the spasms went from severe to mild. His range of motion increased in all areas. By January 13, 2011, Dr. Jacobs felt that Pyle had benefitted as much as he could from chiropractic treatment and released him with no restrictions. Because Pyle still had pain and decreased range of motion in his shoulder joints, Dr. Jacob ordered MRIs of the left shoulder and cervical spine to make sure that Pyle had not "torn something." Dr. Jacobs was certain that the injuries for which he treated Pyle were caused by the accident.

Dr. Jonathan Degnan testified as an expert orthopedic surgeon. Pyle first came to see him in May 2011 for neck and upper back pain. He found that Pyle had some spasm and trigger point that limited his range of motion. He diagnosed Pyle with a chronic cervical strain – a soft tissue injury – for which he prescribed trigger point injections and physical therapy. He explained muscle spasms of the spine can continue for a long time, but noted that six months after an accident was unusual, although not as unusual with someone who did manual labor. Dr. Degnan testified that six months out, he was treating Pyle for both scar tissue and inflamed tissue, which causes treatment to take longer. He explained that muscles normally heal after about six weeks with proper treatment, but can be easily reinjured before then, causing the healing process to start over. He testified that determining the severity of such an injury relied on the truthfulness of the patient and any objective findings. Pyle continued injections until August and completed the prescribed physical therapy on September 13, 2011. At that point, Dr. Degnan found that Pyle had reached maximum medical improvement. He did not believe Pyle would suffer any permanent injury as a result of the accident and felt he could return to his normal daily activities. He opined, to a reasonable degree of medical certainty – based on the truth of the history Pyle gave him, and the fact that he was asymptomatic prior to the October 28 accident – that Pyle's symptoms were the result of the accident.

Dr. Fred Killeffer testified as an expert neurosurgeon for the defense. Four weeks before trial, Dr. Killeffer reviewed all of Pyle's medical records, took new x-rays and, examined Pyle. He concluded Pyle's initial x-rays revealed a "mild straightening of the cervical spine but no [other] evidence of trauma" and "some degenerative changes. . . but nothing else." Dr. Killeffer agreed that Pyle sustained a cervical strain in the accident. On his review of Pyle's February 2011 MRIs, he found no evidence of trauma at all. On his own examination, he found Pyle to have normal curvature of the neck, no side to side displacement, and no muscle spasm. Pyle further had mild tenderness in the area of the muscles over his shoulders, good range of motion of his shoulders, arms, and joints and normal reflexes. Testing of his neck showed that Pyle was "reasonably within the range of normal" – he had a slight tilting of his head to the right side but "nothing of any significance." Dr. Killeffer reported his physical examination of Pyle as "basically . . . normal." Dr. Killeffer formed three conclusions as a result of his observations: (1) Pyle sustained a mild to moderate soft tissue cervical spine strain as a result of the accident, with expected results including mild to moderate pain lasting for up to 10 to 14 weeks, but not beyond; (2) reasonable treatment would include mild oral analgesics and noninvasive physical therapy for 8 to 10 weeks after the accident; and (3) Pyle sustained no permanent impairment as a result of the accident.

Pyle introduced proof of his medical expenses totaling $19,120.62. Pyle explained he did not claim any lost income because the accident occurred near the end of the mowing

season. He testified he just wanted "to be done right." At the close of the proof, the jury returned a verdict awarding Pyle $15,000 in damages. The trial court denied Pyle's subsequent motion for an additur or new trial. The court awarded Pyle discretionary costs in the amount of $4,467.25. Pyle's timely appeal followed.

## II.

Pyle raises issues that we essentially restate and address as follows:

1. Was there material evidence to support the jury's verdict?

2. Did the trial court err in its refusal to instruct the jury on the law regarding aggravation of a pre-existing condition?

3. Did erroneous evidentiary rulings by the trial court deprive Pyle of a full and fair opportunity to present his case and, more probably than not, affect the outcome?

## III.

Regarding this Court's review of an approved jury verdict, the Supreme Court recently observed:

Where the trial judge has approved the verdict in its role as thirteenth juror—as the trial court did in this case—the Court of Appeals' review of the verdict . . . is to determine whether the verdict is supported by material evidence. *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn. 1980); *see also Thrailkill*, 879 S.W.2d at 841; *Ellis*, 603 S.W.2d at 129. Material evidence is "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Knoxville Traction Co. v. Brown*, 115 Tenn. 323, 331, 89 S.W. 319, 321 (1905). An appellate court is required to take "the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501-02 (Tenn. 2012) (quoting *Barkes v. River Park Hosp., Inc.*,

-5-

328 S.W.3d 829, 833 (Tenn. 2010)). The material evidence analysis is very deferential to the award by the jury and the judgment of the trial court when it affirms the verdict as the thirteenth juror. *See Ellis*, 603 S.W.2d at 129 ("[W]hen the trial judge has approved the verdict, the review in the Court of Appeals is subject to the rule that if there is any material evidence to support the award, it should not be disturbed." (emphasis added)). "It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review." *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.*, 586 S.W.2d 117, 119-20 (Tenn. Ct. App. 1979). "It is simply a search of the record to ascertain if material evidence is present to support the verdict." *Id*. Because the material evidence standard lies at the foundation of the right to trial by jury, if there is material evidence to support a jury verdict, the appellate courts must affirm it.

*Meals ex rel. Meals v. Ford Motor Co.*, No. W2010-01493-SC-R11-CV, 2013 WL 4673609 at *5 (Tenn. Aug. 30, 2013)(additional internal citations omitted).

Trial judges have broad discretion in controlling the course and conduct of a trial. *See State v. Caughron*, 855 S.W.2d 526, 541 (Tenn. 1993). Such discretion necessarily extends to making determinations regarding the admissibility of evidence, *see Shipley v. Williams*, 350 S.W.3d 527, 551 (Tenn. 2011), and controlling the scope and manner of examination of witnesses. *See Coffee v. State*, 188 Tenn. 1, 3, 216 S.W.2d 702, 703 (1948). A trial court's "decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of discretion." *Mercer v. Vanderbilt University, Inc*., 134 S.W.3d 121, 131 (Tenn. 2004).

Whether a jury has been properly instructed is a question of law. *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). This court reviews questions of law de novo with no presumption of correctness accorded to the trial court's conclusions. *Id*. (citing *Whaley v. Perkins*, 197 S.W.3d 665, 672 (Tenn. 2006)).

IV.

Pyle asserts that the award of $15,000 is both inadequate and unsupported by the evidence. He reasons that the award "does not even pay [his] medical expenses, much less allow him any award for pain and suffering. In response, Mullins succinctly sets out the relevant line of inquiry, as follows:

The most significant component of the primary issue at trial was which medical expenses claimed for treatment of injuries by [Pyle] were reasonable, necessary, and proximately related to the subject motor vehicle accident. The jury obviously concluded that the medical expenses reasonably related to this accident were considerably less than the amount claimed. The real question on this appeal is whether there is material evidence . . . to support the jury's verdict, as approved by [the trial court].

In personal injury cases the amount of compensation is primarily for the jury to determine. If there is any material evidence to support the award, it should not be disturbed. **Foster v. Amcon Intern., Inc**., 621 S.W.2d 142, 146-47 (Tenn. 1981); **Ellis v. White Freightliner Corp**., 603 S.W.2d 125, 127 (Tenn. 1980). When the trial judge approves the amount of damages fixed by the jury in personal injury cases, the determination is entitled to great weight and "well-nigh conclusive" on appeal. **Ellis**, at 128-29.

In his complaint, Pyle sought $75,000 in compensatory damages for his injuries – headaches, sleeplessness, back and neck pain, pain and suffering, and medical bills, including ambulance and hospital charges, chiropractic treatment, physical therapy, MRIs, and other medical expenses. He did not claim any damages for lost wages or decreased earning capacity. At trial, Pyle testified to his injuries from the accident and their effect on his life. He began seeing Dr. Jacobs for his continuing pain and soreness some two to three weeks after the accident. Over the next two and a half months of treatment, Pyle initially saw some improvement – his lower back pain and daily headaches soon resolved; but he had continuing pain in his neck and upper back, between his shoulder blades. The discomfort left him unable to sleep comfortably. Pyle declined to take pain medications because they upset his stomach. Instead, Dr. Jacobs prescribed a "TENS Unit," a device that administered a small shock to the area of the pain. Pyle said this helped, but that the pain always returned. Dr. Jacobs released Pyle in January 2011 with no physical or work restrictions. On releasing him, Dr. Jacobs ordered MRIs to further determine the cause of Pyle's complaints of continuing neck and back pain.

In May 2011 – some seven months after the accident and four months after being released by Dr. Jacobs – Pyle saw Dr. Degnan. A friend had referred him to the doctor. Dr. Degnan performed a series of trigger point injections at the site of the pain and prescribed physical therapy. In September 2011, Dr. Degnan opined that Pyle had reached maximum medical improvement and released him with no restrictions. Following his release, Pyle received no further medical treatment. He testified that he continued to suffer pain in his neck and between his shoulder blades. Pyle testified he "kept getting a little better" with the treatments he underwent, but added, "I never have to this day been able to function like I

[did] before the accident." He explained that at home, he found it difficult to lift his young children or play sports with them. At work, he could not push a wheelbarrow anymore, pick up anything heavy, or sit on a mower for long periods of time. Pyle said he imposed his own limits on his activities because he knew what he was and was not capable of doing.

Pyle introduced proof that he incurred a total of some $19,000 in medical expenses from the time of the accident to the trial. He introduced a breakdown of his medical expenses as follows:

| Provider | Last Date of Treatment | Amount |
|---|---|---|
| Rural Metro | 10/28/10 | $ 674.38 |
| Mercy Medical Center | 10/28/10 | 1,667.00 |
| Knoxville ER Physicians | 10/28/10 | 342.00 |
| Knoxville Radiological Group | 10/28/10 | 74.00 |
| Dr. Jacobs | 01/13/11 | 4,512.00 |
| Walgreens | 05/28/11 | 51.24 |
| MRIs | 02/18/11 | 3,790.00 |
| Dr. Jonathan Degnan | 09/13/11 | 3,350.00 |
| East TN Spine & Sport-phy. therapy | 09/20/11 | 4,660.00 |
| | Total | $19,120.62 |

Undoubtedly referring to the testimony of Mullins' medical expert, Dr. Killeffer, Pyle asserts in his brief that "[t]he only medical evidence disputing the length of time and expense required for treatment of Mr. Pyle's admitted causally-related cervical strain is insufficient to deny him adequate compensation." Generally summarized, Dr. Killeffer testified that Pyle's cervical strain would have resolved within 10 to 14 weeks after the accident. Dr. Killeffer thus held the opinion that the MRIs and other treatment Pyle obtained after being released by his chiropractor in January 2011 were unrelated to the injury he sustained in the accident. As a result, Dr. Killeffer expressly opined that the cost of the MRIs, and all of the treatment by Dr. Degnan, including the physical therapy he ordered, were not reasonable and necessary expenses in the case at bar.

Dr. Degnan testified he would not have ordered MRIs for one who had experienced only a soft tissue injury because MRIs six months after an accident would not show subtleties in the tiny nerves. As a consequence of this, he concluded that the MRIs Pyle underwent were not medically necessary.

In the present case, the jury was left to consider the differing opinions of the parties' expert medical witnesses – Dr. Degnan and Dr. Killeffer – regarding the nature, effects and treatment of the cervical spine strain Pyle sustained in the accident.  First, we note that both experts agreed that the MRIs Pyle underwent, at a cost of $3,790, were not medically necessary.  As Dr. Degnan explained, he would not have ordered an MRI because nothing indicated that Pyle suffered more than a soft tissue strain, an injury for which an MRI is not an appropriate evaluation tool.  The jury further heard Dr. Killeffer's expert opinion that the type of injury Pyle had would not have been symptomatic any longer than 10 to 14 weeks after the accident.  Thus, any medical expenses he incurred after being discharged by his chiropractor were not reasonable or necessary expenses for which Mullins is liable.  Assuming the jury credited Dr. Killeffer's testimony, it was appropriate for them to deduct $11,851.24 – representing all the medical expenses Pyle incurred after Dr. Jacobs released him in January 2011, without restrictions  – from the total claimed expenses.  Consequently, the jury could have found that Pyle incurred $7,269.38 in reasonable and necessary medical expenses as a result of the accident.  Given the total award of $15,000, it follows that the jury awarded Pyle an additional $7,730.62 for his other claimed elements of damages.

Certainly, there was other, contradictory expert testimony by Dr. Degnan upon which the jury could have arrived at a different result.  Had they accepted Dr. Degnan's opinion, the jury could have concluded that, as a result of the accident, Pyle sustained a chronic cervical strain that required further, extended treatment.  Any such possibility, however, is not the question.  Again, our review of the jury's award of damages "is subject to the rule that if there is any material evidence to support the award, it should not be disturbed." *Porter v. Green*, 745 S.W.2d 874, 879 (Tenn. Ct. App. 1987).  On our review of the record, we conclude that there is material evidence to support the jury's award in the case at bar.

V.

Pyle asserts that the trial court erred in refusing to instruct the jury with respect to a defendant's liability for the aggravation of a plaintiff's pre-existing condition.  In support of his conclusion that such an instruction was required, Pyle contends that the evidence at trial clearly shows (1) that he had a pre-existing "degenerative disk disease" in his neck at the time of the accident and (2) that, as a result of this condition, the effects of the injury he sustained became a chronic condition that necessitated extended treatment.

To begin, the rule is that a trial court "should give a requested instruction if it satisfies three requirements: (1) it is supported by the evidence, (2) it embodies the party's theory, (3) it is a correct statement of the law." *Otis v. Cambridge Mutual Fire Ins. Co.*, 850 S.W.2d 439, 445 (Tenn. 1992)(citing *Hayes v. Gill*, 216 Tenn. 39, 42-43, 390 S.W.2d 213, 214 (1965); *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 837 (Tenn.Ct.App.1980)).

The gist of Pyle's position is that the cervical strain he sustained in the accident became chronic – leading to more pain and extended treatment – because he was already in a weakened state as a result of his pre-existing degenerative disk condition. In this regard, Pyle alludes to the "oft stated principle . . . that a tortfeasor 'must accept the person as he finds him' and the person injured by the tortfeasor is entitled to recover all damages proximately caused by the acts of the tortfeasor." *Haws v. Bullock*, 592 S.W.2d 588, 591 (Tenn. Ct. App. 979). In *Town of Franklin v. Elrod*, 140 Tenn. 228, 204 S.W. 298 (1917), the Supreme Court addressed liability in the context of the negligent infliction of an injury on a plaintiff with pre-existing conditions. The Court stated, in relevant part:

> The liability of one who negligently or unlawfully injures the person of another is not to be measured by the physical strength of the party injured or his capacity to endure suffering. One of weak physical structure, or small vitality, or in ill health, has as much right to protection from violence as a robust athlete, and in either case the physical injury, the bodily harm, which is actually caused by the violence, whether one be strong or weak, healthy or sick, is the natural consequences of the wrong.

204 S.W. at 301. Regarding a tortfeasor's liability for damages stemming from the aggravation of a plaintiff's pre-existing condition, Pyle correctly recites the law. The insurmountable problem with his position is that, in the present case, there is no expert medical proof of aggravation of a pre-existing condition. Pyle's reliance on the testimony of Dr. Degnan is unpersuasive. Dr. Degnan testified that the MRI showed Pyle has "degenerative changes" at three levels of his cervical spine. He testified that these changes occurred over time and were present before the accident. Dr. Degnan was examined regarding the relationship between degenerative changes and neck pain and testified as follows:

> Ms Holt [counsel for Pyle]: And there was some discussion of the degenerative changes that are shown on the MRI.
>
> *     *     *
>
> And does the presence alone indicate that the patient should have pain?
>
> Dr. Degnan: No. It would just make them more susceptible.
>
> *     *     *

-10-

Ms. Holt: Does the presence of degenerative changes impact in any way the course of . . . or could it impact in any way the course of Mr. Pyle's condition in having a longer time to heal?

Dr. Degnan: You're more susceptible with degenerative changes. The joint is not performing its normal function, so the soft tissue has to compensate for that. And it's not made to do that structurally.

\* \* \*

Ms. Holt: Are you of the opinion that a motor vehicle accident can cause some neck pain to manifest in a person who has degenerative changes as a result of the motor vehicle accident?

Dr. Degnan: It's very common.

\* \* \*

Mr. Trammell [counsel for Mullins]: So you've testified that degenerative changes make a person more susceptible for developing neck pain after a motor vehicle accident?

Dr. Degnan: Not just a motor vehicle accident. It could be any kind of trauma.

In refusing the requested jury charge, the trial court, in an exchange with Pyle's counsel, explained its ruling. We quote pertinent portions of the exchange:

Ms. Holt: And the preexisting condition?

The Court: There's no testimony that there was an aggravation of a preexisting arthritis in this case. Dr. Degnan testified he treated and diagnosed a sprain/strain.

\* \* \*

But there's no pleading of . . . aggravation of preexisting condition by [Pyle] in this case. [. . . .]. Secondly, no doctor

-11-

testified they treated an aggravation, or there was an exacerbation of a preexisting condition. Dr. Degnan testified he treated a sprain/strain from this wreck. The chiropractor said he treated a sprain/strain from this wreck. And that's the only diagnosis they made.

*   *   *

Ms. Holt: Dr. Degnan talked about the extent of – the length of his was from the preexisting –

The Court: He had preexisting arthritis but he didn't say anything happened to it in this wreck.

Ms. Holt: That it could prolong his injury, it could prolong his pain.

The Court: It may have. No, he testified that such a condition may make you more susceptible, but he did not testify in this case it made this man more susceptible.

On our review of the record, we conclude that the trial court accurately summarized the evidence in support of its ruling. In summary, Dr. Degnan opined that a person with degenerative changes like those Pyle has is more susceptible to injury and pain and that it was common for a motor vehicle accident – or any kind of trauma – to cause some neck pain to manifest itself in a person with degenerative changes. As the trial court correctly noted, Dr. Degnan did *not* testify that the accident aggravated or exacerbated Pyle's condition or had any specific effect on it at all. In short, we conclude that Dr. Degnan's generalized observations about susceptibility and common correlations between neck pain and "[a]nything that causes an excessive range of motion to an abnormal joint" is not material evidence sufficient to support the requested instruction in the present case. To the contrary, we conclude that giving an instruction on aggravation of a pre-existing condition in the case at bar would have been error. "An instruction on an issue where there is no evidence in the record raising that issue is erroneous." *Carney v. Coca-Cola Bottling Works*, 856 S.W.2d 147, 150 (Tenn. Ct. App. 1993)(citing *Wilson v. Tranbarger*, 218 Tenn. 208, 236, 402 S.W.2d 449, 461 (1965)). The trial court did not err in refusing to instruct the jury regarding aggravation of a pre-existing condition.

-12-

Lastly, Pyle asserts that a "series of evidentiary rulings and comments by the trial court" deprived him of a "full and fair opportunity to present his case." In particular, Pyle challenges the exclusion of evidence which, he says, was offered to show "the force of the impact and the *capability* of this accident to have caused a cervical strain serious enough to still exhibit objective signs of the injury six months later. . . ." (Emphasis in original.)

First, Pyle contends that the trial court erred in refusing to allow certain testimony by Trooper Stroup, the investigating officer. When Pyle's counsel asked Stroup whether Mullins told him she thought her brakes had gone out, defense counsel objected. The trial court questioned the relevance of the inquiry in light of Mullins' admission of liability. The court further stated:

> She admits liability. If we go any further, we'll stop. Okay.
> Next question. You can ask him about what he saw, the damage
> to the vehicles, all that stuff is relevant, but she admits she was
> negligent and caused this wreck.

In further questioning, Pyle's counsel asked the trooper, "and you didn't find anything wrong with the brakes?" The following exchange took place:

> Mr. Trammell: Same objection, Your honor.
>
> The Court: Any other motions?
>
> Mr. Trammell: Yeah. Move to strike the response.
>
> The Court: Testimony will be stricken. Want to challenge me,
> counsel? I told you she admitted liability.
>
> Ms. Holt: I know, Your Honor, but the force –
>
> The Court: You want me to declare a mistrial?
>
> Ms. Holt – of the impact –
>
> The Court: You want me to declare a mistrial?
>
> Ms. Holt: No, Your Honor.

The Court: Then don't ask it again. I told you twice now. All you're trying to do is prejudice the jury against her when she admits liability.

Ms. Holt: No, I'm not, Your Honor.

The Court: and that's the only purpose is to have offered it since she's admitted liability.

Ms. Holt: Your Honor, it's for –

The Court: Do you want a mistrial or not, counsel?

Ms. Holt – purpose of what kind of impact there was.

Ms. Holt next questioned Stroup whether the damages he observed at the scene were "consistent with someone bumping the trailer at less than 15 miles an hour?" When defense counsel objected, the trial court advised Ms. Holt to "lay some groundwork first." After generally questioning the trooper as to his experience in investigating accidents, the examination continued as follows:

Ms. Holt: And part of your job is assessing some degree of what kind of speed would be required to create the damage that you observed?

Trooper Stroup: Yes.

Mr. Trammell: Your Honor, I'm going to object to this testimony. This witness has not been offered –

The Court: He says that – well –

Mr. Trammell: – as an accident reconstructionist.

The Court: Come up here. Come on. Anything else, counsel?

Ms. Holt: No, Your Honor.

The record reflects no further examination by Ms. Holt regarding the estimated speed at which Mullins was traveling. Moreover, Pyle made no offer of proof with respect to

-14-

counsel's attempts to examine the witness on either subject. We hold that there is no error shown in this record with respect to this testimony and the trial court's comments about it.

Similarly, we find no error in the trial court's refusal to allow Pyle to testify to his observations of Mullins' car based on photographs that were taken some eighteen months after the accident. The trial court ruled that Pyle's observations were irrelevant because he did not personally view her car at the time of the accident and therefore had no basis to make a comparison. The photographs in question were subsequently entered into evidence through Mullins' testimony. Thus the jury was presented with "before and after" photographs of Mullins' vehicle, heard testimony concerning the damage to Mullins' vehicle, and could draw its own conclusions.

The jury heard from Pyle how he was suddenly struck from behind. He testified to the force of the impact – how he was forced into the car ahead of him and thrown back into his seat. He described in great detail the damage to his trailer, truck and the mower he was hauling. For her part, Mullins acknowledged that she struck Pyle's trailer and observed damage to its back gate. Numerous photographs depicted the damage to Pyle's property and Mullins' vehicle. Trooper Strout also testified to the damage he observed to all three vehicles, which he estimated at over $400 per vehicle. Both the trooper and Mullins testified that marks to the front of Mullins' car correlated to the bars on the back of Pyle's trailer. Pyle testified that he tried to exit the truck, but immediately realized he was hurt and stayed inside. He left the scene by ambulance. Through his medical expert, Dr. Degnan, Pyle was able to establish how his injury was caused. Dr. Degnan explained "it's not how fast you go, it's how quickly you stop," noting that when you are hit from behind and then run into something in front of you, your body absorbs the energy as you decelerate and can cause cervical injuries.

We conclude that Pyle's repeated efforts to establish, through Trooper Stroup, that there was nothing wrong with Mullins' brakes was irrelevant given her admission of liability for the accident, whatever the cause. Further, Pyle's counsel seemingly abandoned her effort to establish that Mullins was traveling at more than 15 miles per hour, the estimated speed she stated in her deposition testimony. Notably, Trooper Stroup was not offered as an expert in accident reconstruction, and Pyle offered no expert witness on this matter. Moreover, no offer of proof was made with regard to Stroup's testimony. In the absence of an offer of proof and the inclusion of the excluded testimony in the record, this Court cannot consider the alleged errors. *See Davis v. Hall*, 920 S.W.2d 213, 218 (Tenn. Ct. App. 1995).

In view of the evidence presented, we cannot agree with Pyle's contention that he was not permitted to present evidence in support of his contention that the "force of the impact"

-15-

resulted in a serious, prolonged injury. The record is replete with evidence about the accident itself. Again, the case for damages boiled down to a question of whether Pyle was injured and, if so, to what extent? The trial court emphasized this when it explained the basis for his evidentiary rulings regarding Trooper Stroup's testimony, as follows:

> [Mullins] admits that she was negligent and that that negligence caused the accident. . . .
>
> So the issues for you to decide are . . . was [Pyle] injured as a result of that fault? If so, the extent of those injuries. And if so, what damages . . . is he entitled to under the law.
>
> The fact whether she could have been intoxicated and hurt in this wreck does not make him any more damaged, does not make him entitled to any more or less money than that she may have done it just a little bit negligent does not mean he's entitled to any less compensation for any injuries acquired. She's at fault. Period. And so the questions are was he hurt, and the extent thereof. And those issues are the reason why we went around and around the bush this morning.
>
> I've allowed some of this information in about what happened in this wreck because it may . . . help you to determine . . . those issues, whether someone was hurt or not. And that's the only reason we went into some of these details about the wreck, because it may be material circumstantial evidence about the injury. But she's at fault. The question is, was he hurt in this wreck?

Pyle also contends that the trial court impermissibly restricted his ability to show that Mullins' testimony at trial was inconsistent with her pre-trial admission of liability and payment of Pyle's property damages. In particular, Pyle's counsel sought to elicit testimony from Mullins that "the 'responsibility' she had taken included paying for the repairs of the very damage she was now questioning had been sustained in this accident." Pyle refers to testimony by Mullins that she "just couldn't believe the way his trailer looked," and that "the trailer was so tall and there's no way my car could have hit enough to make a dent, I don't think. . . ." When counsel sought to question Mullins whether she "took responsibility for all of the damage to these vehicles," the trial court asked how the inquiry was relevant and concluded, "No, that's been stipulated to start with in the answer." Ultimately, in addition to her admitted liability, which was repeatedly communicated to the jury, Pyle elicited

Mullins' admission that marks on the front of her vehicle correlated with the bars on the back of the trailer. Mullins further acknowledged her deposition testimony that she also observed the back of the trailer was dented. In light of such evidence, we do not agree that the trial court erred by limiting further questioning of Mullins regarding her responsibility, actual or perceived, for the accident.

Pyle further asserts that the trial court erred in excluding character testimony from Jeff Boggan, one of Pyle's customers. Boggan, a resident of Village Green Subdivision, testified Pyle mowed his lawn and he had known Pyle for 5 years. He testified Pyle was under contract by the homeowner's association to mow all of the lawns in the subdivision. Pyle asked Boggan whether he was "familiar with [Pyle's] reputation in that area for honesty?" In response, defense counsel objected as to relevance. The trial court sustained the objection. At the close of trial, Pyle made an offer of proof that "Boggan would have said he knew [Pyle's] reputation in that community for honesty." The following ensued:

> The Court: At that point all [Boggan] had said is he knew he mowed in their subdivision. The point how he would know is all he would know about is him mowing in the subdivision. I had no other basis at that point to know how he would know –
>
> Ms. Holt: I asked in that community.
>
> The Court: – in reputation.
>
> Ms. Holt: And you said, no, that subdivision isn't enough.
>
> The Court: No. That's right. I said the subdivision is not enough, because you have to show the community in which he works or lives is exactly what the case law says. And the community in which he works is not just that subdivision
>
> Ms. Holt: Right.
>
> The Court: He works in a lot of subdivisions.
>
> Ms. Holt: But that subdivision is a place where he works, so that was –
>
> The Court: Okay. All right. Anything else, counsel?

The Supreme Court has addressed the admissibility of character evidence pursuant to Tenn. R. Evid. 608(a) as follows:

> Rule 608(a) generally permits reputation and opinion evidence of a witness's character for truthfulness or untruthfulness, and provides that
>
>> the credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may only refer to character for truthfulness or untruthfulness, and (2) the evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked.

*State v. Dutton*, 896 S.W.2d 114, 117-18 (Tenn. 1995).

In the present case, Pyle's character for truthfulness was certainly attacked when he was cross-examined extensively regarding his failure to include the fact of his earlier accident in prior sworn testimony. As a result, Pyle was entitled to introduce evidence of his reputation for truthfulness. At the same time, before a witness may be permitted to testify to another person's character for truthfulness, a proper foundation must be laid. That is,

> to warrant admitting evidence about a witness's reputation for truthfulness, it is necessary to qualify the reputation witness "through a showing of 'such acquaintance with the [person under attack], the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded.' "

*Id*. (quoting *United States v. Watson*, 669 F.2d 1374, 1381 (11th Cir. 1982))(additional citations omitted). Here, we conclude that no proper foundation was laid to establish that Boggan was sufficiently acquainted with Pyle so as to enable him to "speak with authority" about Pyle's reputation for honesty in the community. Moreover, we conclude that even if shown, any error in excluding Boggan's reputation testimony was harmless. Evidence of Pyle's "honesty" and reputation for telling the truth was admitted through the testimony of his long-time friend and fellow lawn business owner, John Tindell.

Lastly, Pyle contends that the trial court erred in denying his motion in limine that sought to exclude evidence of the earlier motor vehicle accident. In his motion, Pyle argued that evidence regarding the September 17 accident should be excluded as it could "introduce confusion" to inform the jury of an unrelated accident that did not involve personal injury or the same trailer. The trial court's ruling on the motion in limine is not before us. However, both parties appear to agree that the trial court denied the motion based on its conclusion that the subject testimony was relevant to the issue of Pyle's credibility. As a result, Mullins was permitted to question Pyle with respect to his failure to mention the accident in prior sworn testimony on two separate occasions.

"Our cases have consistently held that a prior inconsistent statement is admissible under the Rules of Evidence when the prior statement is used to impeach the credibility of a witness." *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)(citing, e.g., *Jones v. Lenoir City Car Works*, 216 Tenn. 351, 356, 392 S.W.2d 671, 673 (1965) (stating that "prior inconsistent statements of a witness are admissible for the purposes of impeachment and testing the credibility of the witness")). In the present case, Pyle was examined about his omission of the earlier accident and offered his explanation that he simply forgot about it. The trial court properly instructed the jury that it would decide whether any method of impeachment was established and, if so, the weight to give the impeached witness's testimony. The jury was further instructed that a "witness who has been impeached as to a particular fact may be truthful about other facts." We think the jury was entitled to hear the challenged testimony and consider its effect, if any, on Pyle's credibility. The trial court did not abuse its discretion in denying Pyle's motion in limine.

We have reviewed each of Pyle's allegations of error and conclude there was no reversible error in the trial court's evidentiary rulings. " If no errors occurred during the trial, or if any errors occurred but were harmless, the judgment based on the verdict should stand." *Doochin v. United States Fidelity & Guar. Co.*, 854 S.W.2d 109, 112 (Tenn. Ct. App. 1993); Tenn. R. App. P. 36(b). Pyle is entitled to no relief on this issue.

VII.

The judgment of the trial court is affirmed *in toto*. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below. Costs of appeal are taxed to the appellant, Johnny Pyle.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE